2003-30445, State of Missouri et al. v. Joseph R. Biden, Jr. et al. Mr. Tenney, you may proceed. Thank you. Please report. Plaintiffs would be entitled to a preliminary injunction in this case if they could demonstrate that a threat directed at conduct by social media companies causing them irreparable injury. They have not made any such showing despite months of discovery. The district court nonetheless entered a preliminary injunction, and that was erroneous for several reasons. The district court exceeded the bounds of a concrete case or controversy under Article III and impugned government discussion of issues of public concern. The court's injunction cannot be reconciled with principles of equity and cannot be reconciled with the requirements of Rule 65 of specificity. To give just a few examples, plaintiffs have urged, for example, that if there were a natural disaster and there were untrue statements circulating on social media that were damaging to the public interest, the government would be powerless under the injunction to discourage social media companies from further disseminating those incorrect statements. To take another example, plaintiffs urge that if in the course of a law enforcement investigation, a government official were to conclude that it was likely, although not certain, that posts on social media were part of a criminal conspiracy, for example, regarding human trafficking, that the government official would be powerless to bring those posts to the social media company's attention. These are just some examples. So you do not believe that either of those are covered by the exception or exclusion specifically contained in the injunction? Those examples would not be covered by any of the exclusions? That goes to the Rule 65 problem, Your Honor. We don't know whether they are. The plaintiffs have argued that they're not. So at best... Where have they done that, that said your hypos would not be covered? I believe in the stay opposition and I think also in their brief. I mean, they say that what the government can't do is discourage, you know, the posting on social media. I mean, the exceptions are very unclear. And, you know, the carve-out for permissible public government speech, plaintiffs have argued in their response brief, covers only things that aren't otherwise covered by the injunction. They don't think that carve-out does anything at all. We specifically raised the question of whether it was uncertain. They say the district court said that if it was uncertain, then the government can't go after it. So... And these are examples. These are things that they have no standing to challenge, don't cause them irreparable injury, and that are wrong on the merits. The court said that or the plaintiffs told you that? I'm sorry. Who can't go after it? I apologize, Your Honor. The plaintiffs citing the district court's opinion have said that they construe the injunction to mean that if it is uncertain whether conduct is criminal, then it is not covered by the exemption. Now, frankly, I'm not sure whether that's true or not. Our argument in this court is that the injunction is too vague under Rule 65. So I'm not going to tell you that it is or it isn't. That's part of the problem. But the fact that the plaintiffs say that it is illustrates both the vagueness concern and the overbreath concern and the way those two interact. Now, the problem here, just to be clear, is not just overbreath and vagueness. It's more fundamental than that. The reason the district court had so much difficulty crafting an injunction is that the district court didn't actually identify specific conduct of the government that would properly be enjoined. The district court took a broad-brush approach, saying, you know, finding all sorts of things that the government did that it didn't like, and then recognizing, presumably, that that was too broad, then started trying to carve things out. But that's long enough, way more fundamental than just crafting an injunction. That's wrong because what the district court should have been doing is looking for specific things that the government was doing, targeting specific actions by social media companies, causing irreparable injury to these plaintiffs. And if it found any, it could enjoin those. But it didn't find any. That's the problem. You can go through the district court's opinion and look for something like that, or you can go through the voluminous record of this case and look for something like that, and you won't find it. And that is the fundamental problem here with this injunction. So is it your position that the district court could enter an appropriate injunction here if this has just not been crafted well? No, Your Honor. Precisely the opposite. My point is that if the district court were to attempt to craft an appropriate injunction, it would have to find some conduct that was properly enjoined, conduct that both threatened to irreparably harm the plaintiffs and violated the Constitution. So if the government, and by the government I mean high-level officials at various agencies in the administration, were asking social media people in a coercive manner to propagate certain things that the government knew were untrue, and to de-amplify certain things that it knew was true, or didn't know for sure one way or the other, but didn't fit its message, would that be able to be enjoined? Like we think of there's a lot of COVID information in this record about COVID, for example. If I understood the question correctly, one of the premises of the question was that the government was doing it in a coercive manner. And I think if the government was doing something like that in a coercive manner, then that could be the subject of a proper injunction. The problem is that what you would have to do is say, here is what the government is doing that's coercive, and I'm enjoining that. How do you define coercive? I mean, coercive, I don't think there's too much disagreement on this point, but I think that coercive is where a reasonable person would construe it to be backed by a threat of government action against the party if it didn't comply. I mean, that's sort of how the district court described it. The district court went on to talk about significant encouragement, and we have major disagreements with the district court there. But, you know, the example of that in the case law, for example, banned in books, you know, it's sending a letter and sort of threatening prosecution if you don't, you know, comply with what the government wants. Are the recent findings and disclosures from recent U.S. congressional proceedings properly before us to consider? No, Your Honor. Those aren't part of the record. I take it you're talking about materials that were attached to an amicus brief. Those are not part of the record, weren't before the district court. You know, there's been no effort to enter those into the record in this case. We can't take judicial notice of findings by Congress? I mean, you could take judicial notice. From particular committees of Congress? Are we allowed to take judicial notice of that? You could take judicial notice that a committee of Congress has made a finding, if they've made a finding, that the fact of the finding, you can't take judicial notice that everything in the finding is necessarily true and binding on the court. And it certainly wouldn't justify the injunction that the district court issued in this case. I mean, my answer to your question, which was about whether they're properly before the court, is that they're not. And I would love to stop there, but if the court is interested, I'm happy to discuss the materials in there. I don't think they've changed, even if they were properly before the court, I don't think they've changed the picture very much. I mean, what they're talking about, as I understand it, mostly relates to, I mean, the first part of it was about COVID, of the amicus brief and the attached materials. You know, it's not clear that that's ongoing. The district court didn't seem to think it was and thought the government was going to keep going on other subjects. So there's that problem. But then, even on its face, the kind of pressure that's being discussed there, and this has been discussed in a number of cases in the Ninth Circuit, in Kennedy versus Warren and O'Hanley, and in the D.C. Circuit in a series of cases culminating in Penthouse, which was discussed in our brief. The sort of pressure that we're talking about is, you know, relates to, you know, the government is generically going to be angry. The government might make public statements against somebody. If you look at those materials, they reflect a back and forth. Facebook sometimes is willing to do what the government wants and sometimes isn't. Facebook refers to pressure from the administration and the press, administration and others. These are all, I mean, the fundamental First Amendment point, I think that the district court misunderstood here, is that when the government, when the president or representatives of the president or federal agencies come out and say things, they say, here's what we think is true and here's what we think is not true, or here's what we think is a good course of conduct and here's what we think is a not good course of conduct. Yes, that might influence people. People might want to get on the president's good side or people might want to just find it useful. The way you say it is very, you know, we're going to sit down and have a meeting or we'll pass out some document, but what appears to be in the record are these irate messages from time to time from high-ranking government officials that say, you didn't do this yet, and that's my toning down the language. You didn't do this yet. Why haven't you done this yet? And so it's like jump and how high? There's some examples like that in the record. So it's not like we think this would be a good public policy and we want to explain to you why that would be a good policy. There seems to be some very close working relationship that they're having these, this isn't being done fast enough, like it's a supervisor complaining about a worker. Do you have any comment on that? I have several comments on that, Your Honor. I'd like to comment both directly on the materials that you're talking about and also about their relationship. But they're in the record. This is not the extra record. No, I understand. I understand. I'm sorry to interrupt. No, I'm sorry. I understand what you're saying. I'm talking about the record too. And I also want to put them in the context of this case, so I hope I have an opportunity to do both. Please do. Both talking directly, there was a back and forth. Sometimes it was more friendly, sometimes people got more testy, there were circumstances in which everyone saw eye to eye, there were circumstances in which they disagreed. If you were saying, if you don't do this, we're going to impose some penalty, some government regulation or sanction on you, that's not the way you would go about it. You wouldn't say, I'm really mad. You would just say, do this or else, and the or else would be clear. There's no indication in this record of what the or else is. What are they going to do? You have to always have the or else at the same time if you have an ongoing relationship. If you're having this really long relationship, can't the district court find and make a finding, a factual finding that this is enough? Because you think about, and I'm certainly not equating the federal government to this, but this is an analogy, certainly probably an inapt analogy, so if you'll excuse me. Like if somebody is in these movies that we see with the mob or something, they don't say and spell out things, but they have these ongoing relationships and they never actually say, go do this, or else you're going to have this consequence. But everybody just knows because they have, and I'm certainly not equating the federal government with anybody in a legal organized crime, but there are certain relationships that people know things without always saying the or else that are familiar enough. Your Honor, our position is not that the government has to say the or else explicitly. That's not our position, and that's not true. Everybody agrees on that. But it has to be there in the background, and nobody has identified what the or else is with two exceptions that I want to discuss. One is amendments to Section 230 of the Communications Decency Act, and the other is some reference to antitrust law. Now, the idea that if you don't do exactly what this White House staffer says about this particular thing, the president is unilaterally going to amend Section 230 or amend the antitrust laws is far-fetched, and it is not permissible for the district court to make a factual finding that that's the case. And two other points I would make, more in putting it in context, the things that they describe as the most harsh and irate are not about conduct that causes any injury to these plaintiffs. They're about the president's own Instagram account. They're about efforts to obtain information from Facebook. The plaintiffs have not raised a circumstance where they said, you know, that sort of tone or anger was used in connection with the things that are actually before the court in this case. The other thing I would like to add, just in terms of putting it in context, we think the district court was wrong to enter any injunction for some of the reasons that I've specified. But if the district court thought there are a few things that happened here, you'd still have to figure out what they were, and we don't think there were any, but there are a few things that happened here that went over the line, then it would have to say, don't cross that line anymore. It would have to come up with some, it would have to say both, we think this is specific conduct, I can identify with specificity, it's creating ongoing irreparable harm, and I'm going to tell you, you can't do this anymore. Mr. Tinney, your briefs, really from page one, they focus intensely, they focus intently, on government's ability to make statements to the public. At the podium today, you've mentioned government may want to come out and publicly say this or that, but I'm struck by the fact that this case involves government's private communications with social media companies, and it seems perfectly fine, in my view, for government to call out publicly someone for posting or for publishing something that government believes is false or believes is dangerous. I think that passes First Amendment muster with flying colors, but here you have government in secret, in private, out of the public eye, relying on, as Judge Elrod described, fairly unsubtle kind of strong-arming, and veiled or not-so-veiled threats. That's a really nice social media platform you got there. It'd be a shame if something happened to it. Any response to that? Yes, two responses. First, I'm glad to hear all the lobbyists will try to hold you to it, the first part of what you said. The district court enjoined a lot of things that you just described as complying with the First Amendment by flying colors. And so, at a minimum, that would be that part of the injunction under the premises of your question, which, again, I'm not going to try to hold you to. That would be off the table. So you think government public speech is enjoined here? Is that what you're saying? Because if it is, that's important for us to know. Well, the point of service of the question, and I want you to answer his question. What's the part that you think is good in his question? The district court said permissible public government speech on matters of public concern was exempt. I have no idea what that means. The inclusion of the word permissible seems to make it impossible for us to figure it out. The plaintiffs have identified some public speech that they think is enjoined. So if it just said public speech is exempt, then? Well, that would solve part of the problem. Not all of it. Part of it. So if I could turn, that is not what it says. It says permissible. And the plaintiff's view is permissible. That exception literally does nothing. So I just want to put that out there. Then, as to the rest of it, there were several things baked into your question. You know, there's sort of whether it's private and whether it's coercive. Those aren't the same thing. You know, I'll give you an example of private communications that it would be surprising to me if they were enjoined. The CISA switchboarding efforts where state and local governments, including the plaintiff states, would report things to CISA that they think are inaccurate election information. And CISA would pass those along to the social media companies. I don't see any basis for saying that violates the First Amendment. If Facebook comes to the CDC and says, we're trying to figure out whether these posts are true, can you give us scientific information that would bear on that question? It would surprise me if the only way CDC would respond would be publicly rather than privately. Well, isn't it true, though, that time and again, that what government at first may label misinformation or disinformation or malinformation, always with great fervor and certitude and indignation, is sometimes, lo and behold, vindicated as true information, ideas that were labeled false or later proven true? You know, if that happens, that doesn't change the fact that if social media companies are making determinations, whether we like it or not, they're making determinations about what to include on their platforms and what algorithms to use to make some of it more prominent and less prominent. And the social media companies have decided, and there's basically no evidence in the record that this decision was coerced by anybody. They decided that they wanted, in some circumstances, to have those decisions be informed by government experts' views about what was true or false or what was harmful or not harmful. That doesn't mean they were turning over the reins to the government. They were asking the government for information. And now, as Your Honor says, maybe sometimes the government is wrong. What if it's lying? Does it matter if it's wrong or lying between the two? Like, if the government knows secretly that certain things do have health consequences or don't have health consequences but doesn't want that to be the message, just hypothetically, and so then says the opposite to the social media with the idea to propagate that message. I mean, that's a very... Does that matter whether they're lying or wrong between the two? Or not really? That's a very different claim than a claim that it's coercive, that they're somehow, you know, taking over the will of the social media company. Isn't that a claim in this case? Am I wrong? I thought, and I'm not opining on what the truth of the matter is. Please don't misunderstand me. But I thought the claim in the case is, for example, and I think that part of that great Barrington Declaration is part of this case. Is that right? Yes. And that these scientists were not saying the wrong thing and the scientists of the government, the allegation is new that they weren't saying the wrong thing but that they wanted to suppress that because it wouldn't be good for their other scientific message. I am not agreeing with that or disagreeing with that. But that's one of the allegations. And we're going to give you more time because we haven't even talked about standing yet. Okay. Thank you, Your Honor. With respect to the great Barrington Declaration, I mean, what the district courts said, and I'm not sure whether the plaintiffs are saying that it was lying. I'm not aware of evidence in the record that it was. The place where deception came to the fore most prominently was with regard to the FBI, which I'll get to in a second. But with respect to the great Barrington Declaration, what the district courts said was that the government orchestrated what they called a takedown of the great Barrington Declaration. Now, what the email that it was quoting actually said was a published takedown of its premises, which is entirely different. And what the government and what the district court said was not the government was lying and that's why this is a problem. What the district court said was the problem is the government's motivation in making public statements disagreeing. I mean, this is at the heart of what your colleague referred to earlier. This is where the government made public statements saying, you know, we disagree with some of the statements in here. We don't think this is good policy. And the district court said that's unconstitutional. Now, that just cannot be right. And then when you get to the FBI, which is where the deception theme came in, the thing that was allegedly deceptive was the FBI's refusal to comment on a pending FBI investigation. That's it. That's what the district court said. That's what the plaintiffs said. That's the whole thing. I'm sorry, which one was this? This is the Hunter Biden investigation. There were questions about the laptop. The FBI said no comment. In the record, it's clear the reason the FBI said no comment was that the fact of that investigation was not public and the FBI doesn't comment on public investigations. Is it in the record? And honestly, I don't know, so please correct that they said, oh, you need to be very careful of these foreign sources in the same conversations to try to dissuade any follow-up on that when allegedly there's a claim that they knew about that. Is that in this record or is that in the publicly available information that's in the world today that should not be considered? I'm not sure what the same conversation you're referring to is. With the social media people. The record reflects that the FBI generally expressed concerns about a type of investigation. I'm sorry, a type of conduct called hack and leak, where you would obtain illicitly materials and then leak them. The record also reflects that the social media companies were independently already concerned about that, at least in the view of the FBI witness. And so the possibility of such a thing was discussed. The record reflects that. What's in the context of that laptop specifically since you mentioned it? I want to be careful about saying in the context of. There is testimony, there was public testimony in the record that someone had heard rumors that it had to do with Hunter Biden and then a subsequent clarification by the same person that those rumors did not come from the FBI. And so I just want to, I mean, at the end of the day, what the district court said and what this court is reviewing is that they warned of hack and leak operations, which is something I would submit that the government can do. This is a threat to potential foreign influence in American elections. And the FBI can say we're worried that these sorts of things are going to happen. We think they've happened before. So the court can disagree and say that that's unconstitutional if it's not done publicly. I would strongly urge the court not to do so. We're going to give each side five more minutes so we could just go through standing really quickly. You have made a lot of standing arguments that there was a lack of standing. Are there posts made by state officials that were allegedly censored in this manner? I get that you think it was not coercive, but assuming I spot that part, are there government official posts from state governments? And if so, why doesn't that provide standing for the state official? I believe there were three that the states identified, one of which I think there was even some dispute about whether it was really a state official. But there were three that they identified. I appreciate that you set aside the point that there's a dispute about whether that's really traceable to the government. The thing that's fatal to the state standing on this ground, which the other side didn't respond to at all in their briefing, is they have no allegation that they have any intention of making these similar or any other posts in the future. And so they would have to show, in order to have standing, that they have a future injury, ongoing injury attributable to government conduct. So you're saying the federal government is not going to censor, not going to suggest that a state government post be removed ever? Or you're saying state government people are never going to make posts? I don't understand what's not going to happen in the future. It's their burden to establish standing. And they would need to say, we intend to make posts, you know. But don't all state government people make posts all the time, constantly, just like federal government people? And, you know, that's what they do? Your Honor, if your point is that it should have been easy to make this allegation, I'm not sure why it helps them. But it's also relevant on what subjects they would make the posts. And the court would have to evaluate whether it is more than speculative that those posts would, in fact, be subject to both content moderation and content moderation that is based on conduct from the federal government that's being challenged here. And without even an allegation, here's what we plan to post on in the future. Here's why we think the government, we think it's going to be subject to content moderation. And here's why we think the government's conduct in this case that we're challenging is the thing that would cause it to be subject to content moderation. But if the state, okay, the state elections person says, I think the federal government interferes in elections and we need to protect our local elections, would that be a post that could be interfered with? You know, I don't, I mean, that goes to the substance of what the social media company's policies are going to be in the future. I mean, for standing purposes, I mean, I appreciate this colloquy because it highlights the problem. Like the way standing is evaluated is that people come forward with declarations and they say, here's what I want to do, here's why I'm going to have an injury in the future. And then a court evaluates whether they think that it's actually true that they're going to have an injury in the future. And so to say, well, we're not going to bother with the part where we say, here's what we want to do in the future. That that's just fatal to their standing on this ground. It's just, I mean, this is, you know, like. They didn't say that they were going to make these COVID posts about child vaccines in the future. Is that the problem? I think that's one of the topics about, wasn't a state official about children's vaccines from Louisiana. Am I wrong? That's not the fact. I apologize. I don't recall exactly what the posts are about. And I don't want to, I don't want to misrepresent by guessing, but if your question is, is the problem that the record is absolutely silent on whether they're going to make more posts, if they do want what subject and why they think those posts would be subject to content moderation at all, much less content moderation at the behest of the federal government. Then I would say the answer to your question is yes, that is the problem. And if I could say one more thing about COVID, you know, COVID is a great example of why past content moderation may not be evidence of future injury, much less imminent future injury that would give rise to a need for irreparable harm. A lot has changed in the world of COVID both in terms of the social media platforms own policies. Twitter has stopped enforcing its COVID misinformation policy entirely. Without any retribution by the federal government, but, but, and the federal government's, you know, efforts with regard to COVID have changed with the end of the public health emergency. And there's information in the record that the district court seemed to credit that some of the efforts that the federal government was engaged in with regard to COVID were no longer ongoing. And that would be relevant. If the state said, all we're going to post about is COVID, then you would have to say, okay, does the fact that the federal government's doing less of this, that Twitter's not doing it at all. Does any of that matter for standing? And, but we haven't even gotten that far. Okay. You're talking about the future. Let's talk about the present. Will you acknowledge that the government is still in regular contact with the social media platforms about moderating their alleged misinformation? Do you acknowledge that it's still going on? I would acknowledge that there is still some contact, whether the nature of it is identical to what has happened in the past is not, you know, I wouldn't say that, but, but I, we're not arguing that the government has entirely stopped communicating with social medias and this company on this, on this point now. Yeah. Is that why? I mean, I mean, that's part of it also to the extent that we're doing things that were covered by the exemptions, that would have been okay too, but the state makes it easy. So you are still, not you personally, but the federal government is still continuing its day-to-day involvement. Is that right? I'm not sure what day-to-day involvement is. We're not arguing that this case is moot. I mean, this is another problem with the district court's analysis. The district court's analysis of irreparable harm kept talking about voluntary secession and whether it's moot and whether they still have standing. That's not our argument. We're not saying all of this is over and nothing's happening anymore. But the point is to show irreparable injury, you have to say, here's what's going to happen imminently in the future. Here's why it's likely not just non-speculative that it's going to happen. And then you have to make your showing with evidence. And that's just one of the many problems here. I'm over, even in my extended time, I'm happy to keep talking if there are more questions. Thank you. You have saved time for rebuttal. So we appreciate that. Thank you, Jeremy. You may proceed. Thank you, Your Honor. And may it please the court, John Sauer of Louisiana, on behalf of all the plaintiffs' appellees, and then my colleague from Missouri, Mr. Devine. I think we'll address the court for five minutes after I do. I want to start by asking the court to imagine a scenario where senior White House staffers contact the book publishers, you know, Amazon, Borders, and so on and so forth,  and they tell them, we want to have a book-burning program. And we want to help you implement this book-burning program. We want to identify for you the books that we want burned. And by the way, the books that we want burned are the books that criticize the administration and its policies. And suppose they said, we want to be partners in this book-burning effort. And when they didn't get the cooperation they wanted, for example, one time they said, hey, here's 12 authors we want you to pull off the shelves and burn. These are the really bad ones. You got to burn those books. And the booksellers probably said, we don't really want to do that. Then two days later, the White House press secretary was at the podium and said, these booksellers need to burn more books. And the president supports a robust antitrust program to go after them. So they need to do more to go after these books. And later they started sending emails that contained implied threatening communications like, oh, you haven't burned enough books. You haven't let us help you identify the books we want you to burn. And therefore, internally we're considering our options about what to do about it. And when they lose their temper, they use the F-bomb against the booksellers. And then all of a sudden in the middle of July of 2021, there's a one, two, three public punch where the White House press secretary and the Surgeon General state at the podium and they say, these books are poison and we are going to hold you accountable. A word that the district court expressly found carries with it the threat of consequences for letting these books be on your shelves. And then a few days later, the White House communications secretary also goes public and she says, we're just exploring legal liability against you because you haven't burned enough books. And we're looking at repealing a piece of legislation that gives you a huge subsidy worth billions of dollars if you don't burn more books. And then, suppose all the booksellers decided the game wasn't worth a candle and they started complying. And that's exactly what you see here in the record here. In July of 2021, you see the platforms having resisted, you know, the White House pressure for a significant period of time. They complied on a number of issues. They're holding out on certain issues. And all of a sudden, after there's those public threats combined with the private pressure campaign that had lasted for months and months, you see the platform just giving in. And you see them essentially from then on agreeing with whatever the White House and the Surgeon General demanded on those particular issues. And in particular, the White House had said, de-platform these specific speakers. Alex Berenson, because we think he's the epicenter of disinfo that radiates out to the persuadable public. In other words, the most persuasive speakers, the ones who are most effective at rebutting the government's preferred message. The White House is practically saying, take those people down. Tucker Carlson, why aren't you de-boosting a video by Tucker Carlson, a Fox News critic, or Fox News host who's one of the most prominent critics of the administration. And what you see is the platforms complying. They're under what the district court aptly described as unrelenting pressure from the most powerful office in the world. And apparently they complied. So you see in July of 2020. Does it matter if they want to do it anyway? It does not legally. But in fact, there's a factual finding that they did not want to do this anyway. So on both, that argument is a legal answer and a factual answer. Under Peterson against C.D. of Greenville, the Supreme Court expressly said, if the private party would have done it anyway, but the state action is violating First Amendment rights, that's enough. And Backpage, Judge Posner said exactly the same thing in Backpage. He said, even if the threat turns out to be empty, or they would have done it anyway, or they would have folded their tent, that's still a violation of the First Amendment. But actually here you have a well-grounded factual finding from the district court. He said, they wouldn't have done this anyway. And you see this in their emails. Facebook in May 2nd of 2021 is like, we're not going to take down the disinformation, does it? They haven't violated our policies. Three days later, you have the White House press secretary at the podium threatening them with a robust antitrust program, which Mark Zuckerberg has publicly stated is an existential threat to our company. In the very next sentence, he says, take down the misinformation. And then that point goes on. So it's a targeting of specific speakers, specific content, and specific viewpoint that's been so widespread and so effective. It's fundamentally transformed online discourse on questions of absolutely overwhelming social and political significance. Do you believe that there's a fact-finding of overt coercion such that there's not a necessity to get into whether this is encouragement and where the line between encouragement and the various, we've gotten an education about all the historical cases regarding encouragement versus coercion? We have expressed findings of threat after threat after threat, where page 22 and page 24 and page 26 of the district court's opinion, he said, this was an explicitly linking a threat of adverse legal consequences to the White House's demand to target specific viewpoints expressed in the COVID-19 area. Pages 97 and 99 of the district court said some explicit threats are the most obvious form of coercion. He's got a series of factual findings that these statements were threatening. They were received as threats by the platforms, and the platforms acted accordingly. They complied with the threats. But in addition to that, he finds a whole series of implied threats. These are the pressure statements. This is what Judge Wooten was describing as, ah, you've got a nice social media platform. Sure would be bad if something bad happened to it. That's exactly the tenor of these private communications as well. Sorry, Your Honor. So do we have to get into at all, under your theory of the case, what the line is regarding encouragement? You do not. Because whatever that line is, these facts are way beyond it. So if you look, for example, at threats cases, Backpage, Binghamton Books, Acqueti, cases like that, and compare this to the threat in the Backpage case. That's a letter from a sheriff to credit card companies saying, we don't want you to visit us at Backpage, implying that there might be some federal, criminal, or civil liability if they do, even though he's got no enforcement action with respect to that, and asking for a contact person to talk to. And you compare that to, in this case, with the district court count, a whole series of threats in public and in private, going after legal consequences that would have impacts of worth billions of dollars to these companies, combined with this relentless demand for, again and again and again, from all these federal agencies, just peppering them with, take down these accounts, take down these speakers. You have the FBI sending one to five times per month a demand for removal of specific speakers from dozens or hundreds at a time, going all the way back to 2018, saying, take all this stuff down. Can we talk about standing, please? Sure. I'd like to address the first two points that were addressed in the question. Stephen and Holly before, you had asked about the state standing. Do the states have direct censorship injuries? The answer is yes. They're laid forth in the Flesch Declaration and the Bosch Declaration that are in your excerpts of record, where it talks about multiple state officials and state agencies made specific postings on social media platforms. That were taken down, and the district court, with express reference to those, found that that was caused by federal pressure. They said this is happening right when the federal agencies are pressuring the platforms to take this kind of stuff down. And this includes... Evidence in the record to conclude that they were expressly caused by federal pressure? Yes. And what the district court cited on this is the direct, the timing, the chronological identity. Right when the feds are pushing them to take this stuff down, that's when these posts get taken down. That's what the district court found. That's not a clearly erroneous finding. And in fact, you see that same reasoning in Bantam Books, in Backpage, in Aqueduct. That's a primary state standing argument? Wouldn't that be the most straightforward? Why wouldn't that be the... That's there. Why are you not talking about that? Absolutely agree. Their response to that is not that this didn't happen and not that the federal government didn't cause it, because we've got a non-clearly erroneous finding that it did cause it. Their argument is you haven't said that you're going to do this again in the  And that's just wrong. Paragraph 7 of the Bosch Declaration, which is in your excerpts of record, expressly says she is the communications director of the Louisiana Department of Justice, the Louisiana Attorney General's Office. We posted a YouTube video that's a picture of constituents talking to legislators about mask mandates we disagree with. That got taken down right when the White House was saying take down that kind of stuff. And that's what the district court found. And her declaration says now that that's been taken down, we can't put up similar content in the future. So their argument is directly contradicted by the record. That is the evidence of what the district court... And there's a finding from the district court that the states are facing the imminent threat of ongoing future censorship injuries. Based on our evidence, that's not a clearly erroneous finding. Yes, ma'am. With respect to the states that you're seeking to address, is it the censorship on the social media or the government interference with the social media platforms, content moderation? I would say it's the governmental interference has caused the censorship. So there are no platforms that are defendants in this case. We haven't challenged what the platforms are able to do independently. Our argument is when the platforms make decisions, it has to be relieved from the boot of federal pressure and federal coercion that we see going back to 2017 in this case, including threats, secret meetings to Judge Willett's point, secret meetings starting in 2017 where the FBI is brokering meetings and coordinating with senior congressional staffers who are flying out to Silicon Valley. This is all in the testimony of Elvis Chan, secretly meeting in Silicon Valley with the senior content moderation officers of these platforms, showing them adverse legislation. This is what we're going to pass unless you start censoring things. And Elvis Chan opined, having directly participated in that process, opined that the platform's ability, our willingness to start cooperating in the demands for censorship of election-related speech were directly caused by that pressure. Intense pressure is what he calls it. Actually, his master's thesis of all places. So we have direct findings of causation. The district court finds that on page 134 of its opinion, that that is what caused it. So that is what the states are challenging here. And the states' injuries are actually fourfold. There's the direct censorship injury. That alone clearly gets us past the Article III threshold. But also we've alleged that we have a sovereign interest in knowing what our constituents think and feel about the great issues of our day. And Flesch and Bosch attest that we sit on, our communications people sit on social media all day and follow what Missourians and Louisianans are saying on that. That's so important. We've got to be able to craft messages and know what policies we're adopting to be responsive to our citizens. We've cited a story case that radically reinforces that as a state interest, where he says, like, going back to 1863, as everyone knows, going back to the Federalist Number 56 where Madison said it. Everyone knows state legislators have a sovereign interest in knowing what their constituents think and feel. And that's directly impacted. Yes. So, in other words, the Louisiana Department of Justice and the Missouri Attorney General's Office put in declarations saying our communications directors follow Missourians and Louisianans' speech about COVID, about elections, about all the topics that the federal government has interfered with here. They follow it closely on a daily basis. It's imperative that we know what our constituents actually think and feel. And we can't know that because half of that stuff is being suppressed. The viewpoints that the federal government doesn't like are just silence of social media. It's hard to overstate. That's why the district court found in this case this is arguably the most massive attack on free speech rights in American history. Let me ask you what I asked Mr. Tenney. Are we free as a panel to take judicial notice of or otherwise consider the recent findings or releases or disclosures from recent U.S. congressional proceedings? Yes. On the judicial notice point, as Judge Elrod pointed out, judicial notice is a situation where there's no reasonable dispute about the authenticity of the document. And if a congressional committee has released something saying this is an internal email to Facebook, which, by the way, directly reinforces the evidence we have on our side, which is the direct communications with the White House officials, the court can easily say we take judicial notice of the fact that that's a document whose authenticity cannot reasonably question and can weigh and consider that evidence. And all that evidence just powerfully reinforces the overwhelming evidence of coercion we have in this case. You have like a really interesting snapshot of what Facebook's C-suite is saying. They're emailing Mark Zuckerberg and Sheryl Sandberg and saying things like, you know, why do we, why were we taking down speech about the origins of COVID and the lab leak theory? And they're like, well, we shouldn't have done it, but we were under pressure from the administration. That's internal emails or an internal email from Nick Clegg right after that July full court press of pressure and threats from the White House. Nick Clegg emails me internally and he says, you know, given the other fish to fry we have with the White House, I think we ought to deescalate here. So exactly, that's Facebook. That totally reinforces the district court's specific findings that these are all perceived as threats. And that's exactly what Backpage and Bantam Books and Acqueti in cases like that say, well, we know this was threatening because look how they reacted. Okay. So we have two types and you said there are four. There's direct censorship, which is the government officials as a speaker. There's a sovereign interest as a listener.  There's a lot of briefing on whether listeners can be, but that's good enough. But then what's the third and the fourth? Just on that second point, what's fascinating is Carol Crawford, the CDC witness in her deposition volunteered that she agrees with that second interest. She said, look, I want them to take down the misinformation, but I got to know what was censored because otherwise the CDC has to craft messages that are responsive. So she echoes the very thing that we said in our declaration. The third one is a closely related interest, which is the state of a sovereign interest in having fair, free and unbiased processes to petition the government. So one thing you see in the White House emails is the White House says, we want you to crack down on groups and Facebook groups and so forth. And these are the things that are our declarant, Jill Hines, one of the plaintiffs in this case, that I tried to organize these Facebook groups in Louisiana and I couldn't do it. And by the way, her most recent declaration, the one that was filed in May of this year says, this is the interference is still going on. The notion that there's no more COVID censorship is, is not true at all. She says, and so as a result of that, I can't put together 18,000 Louisianans to magnify her voice and petition the government for redress of grievance. And that's a sovereign interest for us. We got to hear from those people. So it's related to the second one. One of the amici, I guess it's the Stanford amici, was unopposed in allowing that brief in, has said factually disagrees with all of that. We've got a footnote in our brief addressing that. There's absolutely dead wrong. Virtually every factual representation in making that brief is directly contradicted by the evidence before the district court, which includes their own public report and their own statements. We quoted some of those in a lengthy footnote in our brief, and I would direct the court's attention to pages 70 to 75 and 80 to 86 of the district court's opinion, where he makes specific findings resulting in the conclusion that CISA and the election integrity partnership were, quote, were completely intertwined. Let me just run through some of the points of contact between the election integrity partnership. I think we've got to get through these other four. Sure.  And then finally, we assert a quasi-sovereign interest against the federal government. They dispute that we can do that. The parties have briefed that, and actually my colleague, Mr. Levine, is prepared to address that. So he can talk about Brookings and whether it's good law.  Okay. Yeah, yeah, right. And our position, of course, is Massachusetts against EPA has not been overruled. It's still good law directly addressed. What's four? If that was number four, it was that quasi-sovereign interest. What was three? The state's injuries are direct censorship, injuries of our own speech, interference with our ability to hear our constituents' voices on social media. Third, interference with our ability to have a fair and unbiased process for our people to organize and petition the government for grievances. And fourth, those are all sovereign injuries. And then the fourth is the quasi-sovereign injury to a substantial segment of our population. And I haven't even talked about the individual plaintiff's injuries yet. Only one plaintiff need have standing. The states, the individual plaintiffs alone have like obvious standing. There's a factual finding in the district court that Plaintiff Jim Hoff is currently subject to an ongoing campaign by federal officials to target the content on his website, and that is corroborated by the affidavit that he put in in May of this year. He says, look at all the ongoing harassment I've been receiving. This notion that my COVID censorship is over is totally unsupportable. Two weeks ago, I gave a talk about this very case at NCLA, our co-counsel's office, criticizing federal government censorship. It was taken down the next day by YouTube. I was censored as a lawyer for attorney, a Louisiana attorney general. Do not tell me that Louisiana doesn't face ongoing censorship injuries as a result of federal interference. But the plaintiffs also have a whole series of injuries. Go ahead, Your Honor. Assuming arguendo, and this is just an arguendo question, that we decide that the individuals do have standing, but that the states don't, wouldn't that affect the scope of the injunctive relief? I was looking at this morning to address that question, and I don't see how, because the injunction is not framed as don't do anything with respect to the states. It just says, don't do these things that take things down from social media. And the individual plaintiff's standing is broad enough to address all of that, because among other things, one of the second interests they address is they say, look, we follow all these people. Every one of the federal officials targeted, the disinformation doesn't. All the people listed in the morality project. Jill Hines has a declaration. She says, I follow 86 of these people on social media, targeted by every single one of these federal agencies. And the Supreme Court held very clearly in Virginia Board of Pharmacy, that when you take down Tucker Carlson, Tucker Carlson's video, it never, it's de-boosted due to federal actions. You never see it in your, your newsfeed that injures Tucker Carlson and the people who follow him, the 3 million people who follow him equally. They both have a first amendment injury because the right to listen is just as fundamental as the right to speak. And these plaintiffs assert the right to listen. They assert the right to listen to virtually every single one of the speakers that was silenced by federal censorship. In this case, they follow the New York Post with 100 by a laptop story being taken down. They follow the, when Robert F. Kennedy Jr. is booted off of Instagram because Jennifer Psaki demanded they take him down, our plaintiffs follow Robert F. Kennedy Jr. They're just as injured under the first amendment. And that's the second injury. And that injury is, I think really is so comprehensive that it just really neutralizes all the arguments. They may not say,  the injunction is too broad. I do want to address the, the alleged breadth and vagueness of the injunction. What I would like to do is direct the court's attention to two sources that relate to the, the alleged breadth of the injunction. If you look at the operative verbs in the injunction, the injunction says you can't pressure,  encourage, or urge. And the government says, well, we just don't understand that. Those verbs are too broad. Those verbs mean it's very plain. It's right there in the dictionary. They're broad, but they're not vague. And here's evidence of that. Nor would the foundational case about state action, the Supreme Court said it is axiomatic that you cannot induce,  or promote. Two of the very verbs that are in the injunction, encourage and induce, are the verbs that are in the Norwood decision. Another, elsewhere in the injunction, it says you can't threaten or coerce. Look at the back page decision. At the very end of the back page decision, Judge Posner directs the district court to enter an injunction on remand with specific language. And here's the seventh circuit's approved injunction. You shall not take any action, formal or informal, to threaten or coerce any third party not to do business with the back page. The exact same verbs that are in our injunction have already been approved by the seventh circuit and are already appearing in Supreme Court decisions. And they say,  we just can't understand this. Judge Bullard, to turn to your question earlier, the dichotomy that we see reflected in the injunction isn't strictly between public and private speech. So it's very bad, it's very telling that a lot of this happened in private going all the way back to 2017. But a public threat, like the letter that the sheriff sent to Backpage in the Backpage case, that was posted on his website in a news release the next day, right? That was a public threat. A publicly made threat still violates the First Amendment as long as they conceded an oral argument in the language of equity. A reasonable observer could reasonably interpret it as intimating some kind of adverse legal consequence. And we have this again and again in here. Imagine you're Nick Clegg of Facebook and you're on the receiving end of all these communications. How would any reasonable social media platform receive them? As a pressure campaign, as a series of threats. And to Judge Elrod's question earlier, we have an entirely different theory of state action, joint participation, that doesn't even require threats or pressure, that the district court also found all this conduct falls within. For example, the Joint Participation Doctrine says that if you've so involved yourself in private decision-making, then you have a state action problem. That's exactly what we have in this case. You have federal officials, every single one of these agencies that insinuated themselves into the content moderation decisions of major social media platforms. And it's occurring at the speaker-specific level when they say, they're at the table when they're deciding, do we take down this specific post? Do we take down that specific post? They're having big group meetings with slide decks about the post that they want to take down. Go ahead, Your Honor. I'm struggling with your public-private. You used an example of a public threat. And that was because that was a threat, that that was actionable. But just public speech about we want companies to moderate content because we have a suicide epidemic of young people. And we think you should cut down this bullying, hate speech directed at targeted young people. And this is a super important problem. And we, the health officials, and the president, and everyone thinks this and wants to cut down. Now, that would not be subject. That's not a threat. It's an announcement of a policy position. That's different than a threat. Yeah, and I think there's a Supreme Court case that addresses United States against Williams from 2008 that talks about the difference between kind of, you know, high-level advocacy and advocacy for concrete action. And what's prohibited by the injunction is you can't say, you can say these suicide-promoting speeches, now keep in mind this is a hypothetical, and they don't contend that it ever has happened or ever will happen. They say someday the Surgeon General might want to do that. And you're weighing that against millions of actually proven First Amendment violations. But on their hypothetical, the Surgeon General can say, all this speech is terrible, it's awful, the suicide-promoting speech is awful. But what he can't do is pick up the phone and say, take it down. He cannot call the booksellers and say, burn these books because these are the bad books. He can get on TV and say, these are terrible books, no one should read them, they're awful. But he can't say, pull them off the shelves and burn them. And that's the dichotomy, right? And keep in mind that threatening is only one of the things that has been joined, because the district court aptly found that as the D.C. Circuit held in the Philip Morris decision, that you've got to look at what the injunction joins in the context of the case and with specific reference to the district court's factual findings. Here we've got 82 pages of factual findings. When the government says, we're so puzzled, we don't know what this injunction requires, the same sort of argument was made in the Philip Morris case where the government said, we don't understand that. What does that possibly mean? And the D.C. Circuit said, go read the 4,088 findings of FACA, flesh that out. And the same response is available to the government here. We've got 82 pages of specific factual findings that they largely ignore in their briefing in this case. And those flesh out the meaning of the injunction. But the dichotomy is between. Does the injunction cover the two hypotheticals that Mr. Kinney began his argument with? The earthquake hypothetical? I think it's that same dichotomy. You can say this earthquake-related speech, that's disinformation, is false, it's wrong. The government can say it's bad. But the government can't say, social media platforms, you need to take it down. Just like the government can't stand at the podium and say, Barnes & Noble, you need to burn the bad books, burn the communist books, whatever it is. They can't say, take down speech on the basis of content and viewpoint. And that's really the dichotomy that the First Amendment already imposes on the government. This isn't like a novel burden. The notion that federal officials should be publicly saying, take down social media posts is a new thing. It's a brand new thing that basically started after the 2016 election. In our country, we don't have a history of federal officials publicly or privately demanding that books be burned and social media platforms. That's their speech. As you know, there are different merits theories at play here. There's a coercion test. There's a joint action test. The proper scope of the injunction might be different under one or the other. On this record, on these facts, which do you think is most squarely appropriate? I believe they are. Very clearly, I believe they are all easily satisfied. But the district court's opinion does focus on the coercion and pressure. So he views those as related tests, right? There's a ton of coercion. And when he gets a significant encouragement, he says, if there is ever a case where significant encouragement applies, this is it. So even if you say, well, some of these statements were too fuzzy to turn out to be threats, we have explicit factual findings to the contrary again and again throughout the opinion. But even if that were determined, he's like at least they're significantly encouraging it. They're bombarding them month after month after month. There's meeting after meeting after meeting. The FBI has been meeting with the senior transit moderation officials of social media platforms on a monthly basis going back to 2018 or 2017. And in all these meetings they're talking about, here's what we want you to take down. Will you take this down? And in connection with that, they're sending them encrypted lists of all the stuff they want them to take down. CISA is engaging in this switchboarding. CISA sets up the election integrity partnership to do the mass surveillance that the government lacks the resources and lacks the legal authority to do and has worked tightly arranged to engage in bombarding them with trying to get them to do it. I'm sorry, Your Honor, I thought you might have a question. In any event, so I would say they're all applicable. The notion that this is, I mean, how can you have more joint participation when you have meetings where the federal officials and the content moderation officials are all sitting there talking together? You have the White House saying, we've got to be partners. We want you to be partners. And when the Facebook finance collapses, it says we want to meet with you and understand what the White House expects of us going forward. That's coercion. That is significant encouragement and that is also joint participation, joint action. It easily satisfies all of those. And because there's this long history of threats, coercion and encouragement, the district court says, look, you can't tell them anymore to take down the content and the viewpoints that you don't like. We are looking at a situation where the injunction is broad because the misconduct is so broad. It's enormous. And this,  is the Philip Morris decision. The DC circuit said that. They said, yeah, this is a really, really broad injunction, but you know what? We've got, you know, dozens of pages of factual findings showing that you engage in misconduct for years. Here, the district court has unrebutted factual findings of millions. That's the court. Yes, you're on it. Complaint doesn't even mention WhatsApp and Tik Tok and Snapchat, many other very popular social media platforms. The injunction does include that. How is that appropriate? The complaint talked about social media platforms, generally. And if you look at the. Specific ones, and the plaintiffs don't have accounts on, or it's not listed that they do. As we pointed out in the brief, we have accounts. The plaintiffs say they have accounts in about seven of those. There's a finding, for example, that the FBI is meeting with seven major platforms. The election integrity partnership had nine major platforms that include Tik Tok, Reddit, next door. When the plaintiffs don't even have accounts on for those, and they're not covered by the complaint. Is that overbroad?  because we have evidence that the state communications directors monitor speech across social media platforms. And of course, what happens on social media is that content is cross posted, right? A Tik Tok video gets reposted on Twitter, a Facebook cover it. Good enough for your purposes. If it covers it from the ones that your clients have. Well, my clients, the state of Louisiana, the state of Louisiana says, as we look at all of them, right? I mean, that's if you read the Bosch and flesh decoration, they say we're monitoring social media activity across these accounts. And the plaintiffs say,  we've got accounts on seven of these. And then the evidence shows that the IP is involved in nine of them. All the ones you mentioned are right there in the evidence with the federal government directly interfering with speech on those platforms. So there's at least nine in the record, seven that the seven or eight that sits in the FBI meet with nine that are affected by the election integrity partnership. And so, and also keep in mind that the government makes a lot of threats that are addressed to platforms. Generically. It doesn't just say, Hey, Facebook do this. It says platforms do this. I see my time is expired. I have a question. What's the activity of the FBI? It's egregious. It was the activity of the white house. There are different. And I believe they're both very egregious. The FBI engaging deception. So with, for example, respect to the Hunter Biden laptop story, they said, Oh, all they did was to decline a common opinion investigation. That's obviously not true. There's a lengthy findings about this in the district court's opinion. He said, they deliberately seeded the platforms with misleading information that a hack and dump operation is coming. A hack and dump operation is coming. There's rumors. It's going to involve Hunter Biden guys. And they, these are on the agenda of the emails that we have in discovery or in the And then when the story, and they have a laptop in their possession, there's a finding of that effect. They knew that it wasn't Russian disinformation. And then having primed the primed, the platforms to expect it as a hack and dump operation would actually hit. Then they said, is this Russian disinformation is a no comment. No comment. The district court found that was a deliberately misleading course of deception. He also found that deception is just another form of coercion. So that was deception. And you see this also with respect to the great Barrington declaration, explicit findings of providing deliberately writing false information with the purpose of inducing them to silence and stifle America's free speech. That violates the first amendment. Thank you. Thank you. Mr.  May it please the court. I'm Joshua divine, solicitor general of Missouri. I want to focus just on state standing and dive a little bit deeper into some of the arguments that my colleague,  Sauer already are already previewed. Are you going to rely on the parents Patria or you want to not focus on that one? I don't think we need to rely on parents. I want to make a couple of points about that, but we have a million and a half different theories of standing where there isn't any circuit split. So I prefer the court to go with one of our other theories of standing. That's not your strongest one and you want to move on. Exactly. Okay. So I do want to leave the court today with two key points. And one of those will be a little bit about parents. Patria first, the federal government's actions have harmed the ability of the states to operate as sovereigns. And second, if we get into parents Patria every single time that the state has asserted a quasi sovereign harm, every single time the Supreme court has allowed that case to proceed under appearance, Patriot theory. So on the issue of sovereign harms there, there are sort of two sovereign harms here. My colleague, Mr. Sauer addressed a number of them already with the state's own speech being taken down. There is a finding on page 138 of the court's opinion where the court says the court makes it an express finding that this is likely to continue in the future for, for a lot of the reasons that the court has already said, every official in every state is constantly posting on social media. This stuff gets taken down all the time. The one affidavit in the one paragraph. Is there anything else in the record to support that? I think the chronology of like my, like my colleague, Mr. Sauer said the chronology here shows that this is related to all of the other suppression that the, the federal government is responsible for. But again, we're, we're posting a lot of we're posting public meetings in front of local County governments, things of that nature where individuals are coming to speak, the individuals who are being censored over these matters. Are they still getting taken down? I think the most recent example is my colleague, Mr. Sauer's take down just a couple of weeks ago. Now there's a second aspect of sovereign harm as well. The Supreme court has long recognized what James Madison said in federalist 56 and what courts have said for centuries, government cannot function unless individuals are able to freely speak in the public square. Here's what the Supreme court said about this in 1949, the vitality of civil and political institutions depends on free discussion. It is only through the free debate, free debates and free exchange of ideas that government remains responsive. So when the federal government blocks individuals like plaintiff, Jill Hines from organizing, speaking to the community, speaking to the government, it deprives the states of the information we need to exercise our sovereign functions. That is more than enough. And I know it also, it doesn't matter whether this is on Twitter or Tik TOK or anywhere else. All of these are part of the public square under the Packingham case from the Supreme court in 2017. How is this theory of third party standing materially different than a argument? So in the parents, Patria snap, the snap decision at page 602 makes clear that the doctrine of parents, Patria only applies for two kinds of harms, a purely third party harm or a quasi sovereign harm. So with respect to our sovereign harms, the entire doctrine just doesn't apply. We're not under parents. Contrary, we're under Kowalski instead we're under first amendment, third party standing, which the sprinting court has said is quite forgiving. So we don't need to have our own first amendment rights. We just need to have an article three injury that is related to somebody else's first amendment rights. And here are injury flows from the first amendment violations experienced by individuals. So now my colleague on the other side says, well, you can only assert this if there's an enforcement action against the plaintiff. And that's not true. Bantam books expressly rejects that idea. So in Bantam books, you have a New York company that is challenging a Rhode Island statute that has been enforced against the Rhode Island company. And the spring court says, well, it doesn't really matter that this isn't being enforced against you, the plaintiff, because the first amendment violation against the Rhode Island company is having an economic downstream article three injury on you, the plaintiff. So you can exercise third party standing in the context of the first amendment to sue over that. Your theories mean that, sorry, the states would have standing to sue the social media companies directly, even if the remedy might be a little different. I think, I think there, there might be a situation where you can bring a, a challenge under a federal statute where they're operating under color of law because of a joint participation theory. Obviously we haven't done that here. I think that would be a, the theories would be quite different in that, in that kind of circumstance. Do a quick followup. Do each of your sort of theories of standing? Do they independently justify the injunction in its full A to Z scope? Or do some theories only support certain aspects of the injunction? I agree with my colleague, Mr. Sauer that each of these individually supports the entire injunction. I think it's easiest to click easiest and clearest to see what the states between the two states we have today, we have millions of people involved. I don't see any way where you couldn't have this exact injunction, especially if you have state standing. I understand, I see my time has expired. I'm happy to answer some questions about parents. Especially if we have state standing. What if you don't have state standing despite your points today? I agree with my colleague, Mr. Sauer, but there's nothing in the injunction that is pertained to the states specifically, especially given how much each of these individuals are following. Dozens, hundreds, thousands of other based upon their followership. What is the best case that says a following is good enough for an injunction in this type of First Amendment? The Virginia Board of Pharmacy case expressly recognizes this ability to, this First Amendment right to listen, to receive information. Now, the other side says, well it depends on what the targeted audience is. And here, the targeted audience is anybody on social media who wants to follow this. So, I mean, we're in a totally different area than we would have been 20 years ago, 30 years ago, before social media, because social media has just broadened dramatically the kinds of audiences. I'm happy to answer a couple of questions on parents, Patriot, the court desires. Well, I keep bringing it up. Massachusetts, the EPA. Is it even a parent's Patriot case? You know, we were just talking about Brackeen, and that is definitely a parent's Patriot decision. But is Massachusetts, the EPA, a parent's Patriot case? It certainly does still exist. It is, and it's not even the first, it's the second. The first is Nebraska against Wyoming from 1995, where Wyoming brings a cross-claim, a counterclaim against the federal government. And on page 20 of that opinion, the Supreme Court expressly says, well, they're bringing a quasi-sovereign interest here, so we will allow this to proceed. Massachusetts against EPA, same thing. Like we do here, Massachusetts asserted a number of different injuries. One was a quasi-sovereign injury. Yeah, but mostly it's the injury to the state from the environmental harm. Yes, that's right. And the Supreme Court, in footnotes 17 of that opinion, says that this is a quasi-sovereign interest. They distinguish this from Mellon, which expressly said it did not involve a quasi-sovereign interest. And the same thing is true in Bracken as well. If you look to footnote 11 of that opinion, the Supreme Court faults Texas for raising only purely private claims. So if Texas hasn't raised, it did not raise anything that,  involved a concrete injury to the state. That's the problem in Texas. Now, you do have this quote that the other side relies on, where it says, you can't bring a parent's patria action against the federal government. And of course, we pointed out that in SNAP and Kentucky against Biden, there are two different kinds of parents' patria actions. So I would just focus this court's attention on the recently decided Supreme Court case, Cherokee Yaw Hawke Bunkazi, please don't make me say that twice, where the court says, general language in judicial opinions should be read as referring to, in context to circumstances similar to the circumstances then before the court, and not referring to quite different circumstances that a court was not been considering. The Mellon Bar- I would have your argument. Okay. Thank you. Thank you very much. Thank you. We appreciate it. You save time for rebuttal. Thank you, Your Honor. Thanks for the extra time. Oops, sorry. I wanted to start by talking about the facts. The plaintiffs cite the district court's findings, and then they cite their own, in their brief, largely their own findings, proposed findings of facts. And it's really important to look past those and look at the underlying documents that are in the record, because as we pointed out in our brief, and I'm not sure the plaintiffs really dispute this, there are circumstances in which those things do not match up. And a couple of them came up from the podium today. I'll just point those out as examples. But my general point here is, there's a voluminous record of documentary evidence. The plaintiffs had proposed findings, the government had responses to those, and the proposed findings cite particular materials. And so just to give two examples that came up from the podium, the first was the district court's finding about what it means for somebody to be accountable. The citation's a little confusing there, but I think what the district court was referring to was 14822 of the record, the deposition of Mr. Waldo. And what he said, the question was, do you agree that accountability includes accepting the consequences for when you do something wrong or inappropriate? And he agreed with that. So that's accountability in the sense of, you know, I'm accountable for, you know, in another place in the record, President Biden said, you know, people should look in the mirror and, you know, they should be accountable in that sense. And so the district court said, oh, they admitted that accountable needs consequences. Well, you have to look at exactly what these people said, and it's really not the way the district court portrayed it. The second thing is, you know, they say the press secretary threatened them with legal liability. As we pointed out in our brief, the district court put in quotation marks words that the press secretary did not say at that press briefing. You have to look at the actual press briefing. You can't just say, oh, they're doing all these threats, you know, they're threatening people with legal liability. Look at what she said. And what she said is just, you know, there was a mention, a litany of policy proposals, you know, more privacy protections, robust antitrust. You know, they talk about reforms to Section 230. These are the sorts of things the press secretary has to be talking about. The other mention of antitrust, as we discussed in our reply brief, was in response to a question about oligarchies. And she said, you know, we support reforms in antitrust law. These are not threats. But the idea that you would say those statements by the press secretary meant that if you don't follow specific directions from the White House about taking down particular posts, we are going to change the antitrust laws and change Section 230. If the district court made a factual finding like that, it's clearly erroneous. I'm not sure the court actually did, but if it did, that's clearly erroneous. That is not support. What about the president's own comments that social media platforms are, quote, in that statement, but powerful nonetheless?  It may be a powerful statement. And so the legal question then would be, is it proper for a district court to say the president can't make powerful statements trying to persuade the public about what people should or should not do? The president isn't subject to this injunction, is he? I thought he was specifically excluded. That's correct. But so, you know, if the press secretary had said that about the president's views, you know, that would be subject to it. And it's extraordinary to say if the president's view is that certain conduct of disseminating information is harming the public safety of the United States of America, that the press secretary cannot express that view. If it's backed by a threat, if it says, and if you don't do what we want, then this will happen to you, that's different. That's what the cases are about. But that's not what happened in this case. For any of this, it's not just that one. They haven't named one. You know, they flag things. They flag, you know, they say the FBI got a 50% rate of having the posts that it identified taken down. I'm surprised it's that low. Usually the FBI's probably right about whether it's foreign influence or not. The social media companies, the idea that the social media companies felt like they had to bend to the FBI's will when half the time they didn't. I mean, this is just, this doesn't support any of these theories. I'd like to just point out the chronological point we made in our brief. Twitter and the other social media companies adopted policies in 2020 about COVID misinformation. They say this is attributable either to a White House pressure campaign that began in 2021, which is obviously not true. We didn't go in a time machine. Or they say it's attributable to congressional pressure from before then, which is not part of this case. You can't sue the executive branch and say members of Congress put too much pressure on social media companies. That's their whole theory of coercion. The whole thing falls apart on the facts. Now, just a couple points about what happened in the district court, and I see my time is running out. They say you don't have to get into significant encouragement. I think I heard him say that. For some agencies, all the district court found was significant encouragement, not coercion. So if, you know, you may think that it satisfies the- Does coercion necessarily entail a threat either overt or covert? Isn't a directive itself enough to constitute unconstitutional coercion? Is it an absent and or else consequence? I guess I'm not sure what a directive means without a threat. Do this. Why haven't you done this? Get this done. FBOM, do this. I mean, the FBOM thing, to be clear, is not about content moderation at all, so I just put that out there. But I mean, I think the reason things, you know, if you yell and scream at somebody to do something, but there's no consequence if they don't do it, no, I don't think that's coercion. Wasn't it about taking something down? What? Wasn't it about taking something down? No, it was about the president's Instagram account and something that had happened to it. Okay. Two last points. One about what happened in the district court. The question about whether you can take judicial notice is only part of the question. I mean, the other thing is these materials were not even, maybe the district court could have taken judicial notice. We would probably dispute that, but these materials were not before the district court. They're not a basis for upholding the district court's conclusion. You know, this is, I mean, if the plaintiff had come in with a new declaration on appeal, that might be admissible evidence, but that doesn't mean this court could consider it in this appeal. So that should just be out. And on a related topic, in terms of what was in the district court, on listener standing, the district court didn't adopt listener standing. Oh, I see my time is up. If I could wrap up very quickly. And all the district court said on the subject in the context of class certification was it didn't think the plaintiffs had established, you know, that they were harmed by things that happened to other people. And that just ties into the point that standing is not dispensed in gross. You have to find for each claim as to each defendant, each thing you're trying to enjoin, that it's going to harm these individual plaintiffs. Thank you, Your Honor. We request that the preliminary injunction be reversed. I just wanted to close by reminding the court if the court is disinclined to do that, I would just remind the court that we have asked that the court extend the stay for at least 10 days in case the Solicitor General wishes to pursue Supreme Court review. Thank you. We have your argument. We appreciate all the arguments here today. The court will stand adjourned pursuant to the usual order.